249 So.2d 338 (1971)
Edward H. BREEN
v.
BITUMINOUS CASUALTY COMPANY and the Pontchartrain Hotel.
No. 4481.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1971.
*339 Steven R. Plotkin, Owen J. Bradley, New Orleans, for plaintiff-appellee-appellant.
Wicker, Wiedemann & Fransen, A. Remy Fransen, Jr., New Orleans, for defendants-appellants.
Before REGAN, GULOTTA and BOUTALL, JJ.
BOUTALL, Judge.
This is a suit by an employee, Edward H. Breen, for benefits due under the Workmen's Compensation Act as a result of injuries sustained while working as a bellman at The Pontchartrain Hotel, which was insured by Bituminous Casualty Company. The trial court found that the plaintiff suffered permanent partial disability and awarded $2,000.00 under the schedule for such disability, together with penalties and attorney's fees, subject to a credit of $770.00 previously paid for temporary total disability of some twenty-two weeks at the rate of $35.00 per week.
From this judgment the defendants, employer and insurer, have taken a suspensive appeal contending that the court erred in awarding penalties and attorney's fees, because they were in good faith and because they had previously tendered into the registry of court the amount due on the main portion of the court's judgment. An appeal, devolutive in nature, was taken by the plaintiff, contending that the court erred in awarding only compensation benefits for partial disability rather than benefits for a total and permanent disability.
The facts of the case are that the plaintiff, Edward H. Breen, was employed as a temporary employee of The Pontchartrain Hotel in the capacity of a bellman. Breen had been employed at the hotel from March 18th through July 12, 1966. On July 12, 1966, he fell down an elevator shaft, and sustained the injuries which are the basis of this suit. Breen was attended by Dr. G. Gernon Brown, Jr., who was the only physician to testify in this case. The employer paid all of the medical expenses incurred by Breen and began paying workmen's *340 compensation benefits for temporary total disability at the rate of $35.00 a week, and continued to make these payments for a period of twenty-two weeks in the total amount of $770.00.
Dr. Brown continued to treat the plaintiff until sometime in' December of 1966 at which time he concluded that the plaintiff could return to work, and accordingly the compensation payments due plaintiff were terminated on December 20, 1966. The plaintiff did not return to work at that time because he was a student and was attending school, but nevertheless, he insists that he could not have returned to work at that time because he was experiencing great pain whenever he moved his shoulder, and testified that he still continues to have pain in this area. Plaintiff filed suit on May 15, 1967, alleging that he was totally and permanently disabled as a result of the accident.
The first issue to be considered herein is the nature and extent of the injuries suffered by the plaintiff. As remarked above, the only medical evidence produced on the trial was the testimony of Dr. Brown, together with certain of his reports which were entered into the record.
Dr. Brown testified that the plaintiff came to his office shortly after the accident complaining of pain in his left shoulder and his left rib cage, as a result of falling into an elevator shaft. The doctor found abrasions over the left rib cage and the upper left extremities, together with swelling and tenderness over the shoulder. There was pain on motion of the shoulder. X-rays revealed that the plaintiff had a comminuted fracture of the greater tuberosity, with slight displacement. The arm and shoulder were immobilized by use of a sling and gradually over the course of treatment plaintiff was gradually permitted to use his shoulder. In due course, the fracture of the greater tuberosity healed, however, the doctor found some calcification in the soft tissue near the shoulder which appeared to be in the rotator cuff, which are the tendons which attach to the shoulder. This calcification remained up to the time of the doctor's testimony. The pain gradually subsided, until the doctor reported that in December of 1966, the plaintiff would be able to return to his former occupation although he still complained of some discomfort and weakness in the left shoulder. A subsequent examination in the beginning of January, 1967, revealed that there was still some degree of impairment to function in the plaintiff's left shoulder which the doctor computed to be approximately 25% at that time.
The plaintiff was not examined again by Dr. Brown until August of 1967, at which time the doctor concluded that the permanent impairment of the shoulder was about 10%, that there was still the calcification in the soft tissue overlying the head of the humerus and the greater tuberosity, and that the plaintiff still had complaints of discomfort and weakness in his left shoulder. This situation still persisted in the doctor's next examination on January 29, 1968. On March 18, 1970, the examination was still essentially the same, together with the same complaints.
The only other witness to testify in the case was the plaintiff himself. In general his testimony is to the same effect as that of the doctor, except that he insists that when he lifts heavy weights, he suffers much more severe pain than the doctor seems to indicate, and informs the court that he does experience some weakness and difficulty with the use of his arm and shoulder in an elevated position. At the time of the accident he was on vacation from school and since the course of treatment extended into the school year, instead of returning to work he returned to school. At the time he was a student at Pearl River Junior College. During the remainder of the school term there, his only problem was an inability to engage in the physical education program at college and he was excused from participation in the program. During this time he did experience some discomfort from time to time depending *341 upon how he used his left arm and shoulder. Since that time he has had an assortment of jobs, interspersed with attendance at school, and his testimony is to the general effect that whenever he was engaged in lifting heavy weights, he suffered some pain, or whenever he was required to lift weights above his head, he suffered pain. He worked for varying periods of time as a shipping clerk for Standard Hardware Company, a carpenter's helper, a platform man and also as a cleanup man for Greyhound East, loading and unloading buses, and now he works as a merchandiser of hosiery with Uddo and Associates. His job experience is such that he suffers pain when he lifts something weighing more than 40 pounds, and is unable to lift weights of 100-200 pounds without assistance. The doctor testified that some discomfort can be expected of this man when he would engage in strenuous labor, and it appears that he does so experience this discomfort, although he indicates that it is much more severe than the testimony of the doctor would indicate.
The parties to this suit have stipulated that in the event the trial court should find that there was partial permanent disability, rather than total permanent disability, that the proper benefits under LSA-R.S. 23:1221 would be loss of use (in whatever degree found) of the arm entitling plaintiff to disability at the rate of not less than the minimum of $10.00 per week nor more than the maximum compensation rate applicable to him of $32.00 per week for a period of 200 weeks. The trial judge found that the plaintiff did suffer a permanent partial disability which he apparently rated as 10% disability of the shoulder or 5% of the arm, and found that the plaintiff could do work of a reasonable character. In accordance with the stipulation he rendered judgment to this effect granting recovery in the sum of $2,000.00, being the minimum of $10.00 per week for 200 weeks.
We are of the opinion that the judgment of the trial court was correct in this regard, and we reach the same conclusion. When considered together, the testimony of the doctor and of the plaintiff show quite clearly that this man will suffer some discomfort whenever he should lift a heavy load with his left arm, or whenever he is required to lift a load above his head. However, the nature of his work as a bellhop is such that he is not prevented from exercising the responsibilities of that job, and in fact was able to perform much more substantial labor in jobs he had subsequent to that.
This brings us to a consideration of the second issue posed to us and that is the awarding of penalties at the rate of 12% on all amounts due and owing, and an award of $1,500.00 as attorney's fees under LSA-R.S. 22:658. As noted above, the defendants paid to plaintiff compensation at the rate of $35.00 per week for temporary total disability from the date of the accident to December 20, 1966. The plaintiff was then cut off of compensation benefits until, on January 3, 1968, the plaintiff was offered the amount of $1,230.00. The defendants contend that by virtue of this offer they should not be held responsible for any penalties whatsoever. They insist that they were in good faith at all times and they made payments promptly as they were due.
They contend that the proper method of computing their responsibility is as follows. Based upon the report of the doctor it was later determined that the plaintiff was entitled to additional payments under LSA-R.S. 23:1221 at the minimum rate of $10.00 per week for 200 weeks. Because they had already paid the sum of $770.00 for temporary total disability, they were entitled to deduct that sum as a credit by withholding payment for a period of 77 weeks (the sum of $770.00 at the rate of $10.00 per week), and therefore no further payments would be due to the plaintiff until the expiration of the 77 weeks from the date of the injury, to wit: January 3, 1968, at which time they made their offer for the remaining *342 123 weeks of the 200 week period, that is $1,230.00.
In support of their position, appellants refer us to the jurisprudence of this State and particularly to the provisions of LSA-R.S. 23:1223, which specifically provides that:
"§ 1223. Deductions from benefits
Where compensation has been paid under subdivisions (1), (2), or (3), of R.S. 23:1221, the amount of such payment shall be deducted from any compensation allowed under subdivision (4) thereof or under Sub-part C of this Part."
With the plain wording and intent of the statute, there can be no quarrel, and our courts have consistently maintained that such payments should be deducted. The trial court in this instance did give such credit in its judgment. The question here is not whether credit should be given, but the method used in arriving at the deduction which the court granted. In other words, did the defendants have the right to cut off all weekly compensation payments which were unquestionably due and owing at the time, until such time as the amount due under the partial permanent disability was the equivalent of the amount already paid due to total temporary disability? The test is, of course, set out in LSA-R.S. 22:658, which provides that failure to make payments when due shall subject the insurer to a penalty of 12% damages on the amount due and all reasonable attorney's fees for the prosecution and collection of that amount when the failure to pay is found to be arbitrary, capricious, or without probable cause. It thus becomes necessary to inquire into the facts in this particular case to determine whether the payment device employed meets the test of this statute.
The record reflects that there is no question but that, at the time of the plaintiff's discharge in December of 1966, Dr. Brown felt that there was some residual disability of the plaintiff. Upon inquiry by the insurer, Dr. Brown reported that there was still discomfort and weakness in the left shoulder and that there was some limitation of movement, and that there was some calcification in the rotator cuff. The insurer than made further inquiry of the doctor, and in a later report, the doctor informed them that the patient will probably have some degree of impairment in function in his left shoulder, but that he preferred to wait until approximately one year had elapsed since the injury before making a final evaluation. Upon being again pressed for some definitive evaluation by the insurer, Dr. Brown, in another report shortly thereafter, reported that the patient had approximately 25% impairment in function of his left shoulder at that time (February 14, 1967) and reiterated his request to defer final evaluation of the patient's partial permanent impairment in function until one year after the injury. The doctor reexamined the plaintiff on August 21, 1967, and concluded at that time that he had a 10% partial permanent impairment in the left shoulder which would have the effect of approximately 5% disability of the upper extremity. In subsequent examinations he found no change up to the date of the trial.
It is obvious from the testimony of the doctor and the reports which were placed in evidence that there was no question at any time but that this man was suffering from a permanent partial disability. The only thing that was ever questioned was the amount thereof. The doctor, after being pressed by the insurer, informed the insurer at the time of discharge that the disability amounted to 25%, but expressed preference to wait until later to determine what it would finally be. This was finally determined to be 10%. Despite the knowledge that the insurer had, it cut the plaintiff off of compensation entirely and preferred to wait until such time as a final determination could be made, a period which would take at least six months to expire under the doctor's own request, before making any determination as to what *343 benefits should be paid. Obviously it was in hope of a smaller percentage of disability being then determined. Regardless of the rate of disability to be finally established, this court can only conclude that it was arbitrary and capricious to not pay at least the weekly minimum amount of $10.00 which the employee was due under the law. We are of the opinion that if the employer and the insurer should choose to wait for a period of at least six months before determining what the precise amount of the compensation should be (and by their own admission it was obviously to be at least the minimum of $10.00 per week for 200 weeks) then the defendants should be made to take the consequences of their action, to wit: the imposition of penalties as provided by the statute. This is not a situation wherein the insurer may have some reason to conclude that there may be no further benefits due at all. Quite clearly, the only question that every arose was whether the payments due each week would exceed the minimum amount of $10.00. The plaintiff was due the original payments weekly for temporary total disability and was due weekly payments for permanent partial disability thereafter.
The appellants have referred us to a number of cases which they cite as authority for their position. They contend that the payments that they made were timely and that the method of computation they used his the approval of our courts. They refer to the cases of Anderson v. Continental Can Company, 141 So. 2d 48 (La.App. 2 Cir. 1962); certiorari denied 1962; Miller v. General Chemical Division, 128 So.2d 39 (La.App. 1st Cir. 1961); Hammond v. Sewerage & Water Board of New Orleans, 204 So.2d 699 (La. App. 4th Cir. 1967); and Hall v. Pipe Line Service Corporation, 233 La. 821, 98 So.2d 202 (1957).
In the case of Anderson v. Continental Can Company, supra, the trial court found the plaintiff suffered total and permanent disability, but rejected his demands for penalties. The Court of Appeal reversed the decision of the trial court, and found that the plaintiff had a permanent partial disability. However, this case is not applicable here for the simple reason that the court pointed out that the plaintiff neither appealed nor timely filed an answer to the appeal which eliminated the necessity of discussing whether the employee was entitled to any penalties for the employer's refusal to pay the compensation adjudicated to him and thus limited the question as to whether there was any compensation due, and if so, the amount thereof.
In the case of Miller v. General Chemical Division, supra, the trial court found the plaintiff to be permanently partially disabled and awarded compensation for 100 weeks subject to the credit for the amount paid for temporary total disability. The court denied the request for penalties and attorney's fees. In discussing this portion of the judgment, the court noted in Miller that the plaintiff was paid full compensation during his period of disability and had been and was presently being employed by defendant employer at wages in excess of those received at the time of injury. Since the injury suffered was scarring and depigmentation of the face which caused an unsightly appearance but which had nothing to do with the inability to perform work, the court simply held that there was no arbitrary or capricious action on the part of the employer which would cause the penalty to be imposed. It is to be further noted that in this case the plaintiff was claiming total and permanent disability because of pain and disability of his left foot. The court found that no pain or disability existed in connection with it, and only awarded recovery because of the scars involved.
In the case of Hammond v. Sewerage & Water Board of New Orleans, supra, the court noted that the issue of the denial by the trial judge of penalties and attorney's fees was not before the appellate court because the plaintiff did not take any appeal. However, in dicta the court *344 mentioned that they thought the judge was correct in not awarding the statutory penalties and attorney's fees because the defendant had not acted in an arbitrary or capricious manner. The record shows that the amount finally awarded was the sum of $2,500.00 representing $25.00 per week for 100 weeks, but that the plaintiff had already been paid compensation benefits in the amount of $2,154.32, leaving a difference of $345.68, and additionally, he had been placed on sick leave which, although it did not take the place of compensation, amounted to the sum of $1,775.59, which gave him benefits well over the total amount due.
The appellants place special reliance upon the case of Hall v. Pipe Line Service Corporation, supra, although there is some discrepancy in the computation posed to us. The court in that case allowed plaintiff benefits for a period of 125 weeks based upon partial permanent disability of 17½% or $7.05 per week. The employee had previously been paid the sum of $480.00 for temporary total disability and then cut off compensation entirely. The trial court had dismissed plaintiff's suit, and the court of appeal reversed this finding, finding that the employee was permanently partially disabled, but did not allow the penalties and attorney's fees because it found that the actions of the defendant were not arbitrary or capricious. An examination into that case shows that three doctors testified, one placing the disability between 5 and 10% of the foot, one placing the disability at about 10% of the foot, and the third placing the disability at 30% over all the body. The trial court had apparently felt that plaintiff had received all the compensation to which he was entitled and dismissed plaintiff's suit. Obviously, there was a serious dispute as to the extent of the disability suffered by the plaintiff in that case, and we note that a different result could occur in the case, depending upon which doctor was to be given the most credence. (The appellate court simply took an average of the percentages.) It is noted that the wages of the plaintiff in that case were such that 65% of his weekly wage amounted to $40.30. To apply these various percentages it would appear that 5% of this amount would be $2.02 per week, 10% of this amount would be $4.03, and 30% would amount to $12.09, actually for an extra period of weeks. In any event, the law at the time of the accident (June 15, 1953) was such that the minimum payment was $3.00, instead of the present $10.00. Thus it may be seen that depending upon which physician the court believed, the prior payments would be in excess of, almost even with, or much less than the compensation finally determined to be due. Under the circumstances, of course, the court found that there was no arbitrary or capricious refusal to pay the benefits.
In the above cited cases, the question of penalties was not at issue or there was a bona fide dispute between the parties. In the present case there is no dispute as to the partial disability of plaintiff, and there never was any question at all as to the liability of the defendants for at least the minimum weekly payments at the time compensation was discontinued. We refer to the case of Fruge v. Pacific Employers Insurance Company, 226 La. 530, 76 So.2d 716 (1954) for a similar situation, which we consider to be decisive of the question here.
The principle that the insurer cannot cut off weekly compensation benefits when it knows that the employee is at least partially disabled is well established in our law. When it does so, its arbitrary action will subject it to the statutory penalties. Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695 (1952); Mitchell v. Connecticut Indemnity Company, 161 So. 2d 460 (La.App. 1st Cir. 1963), certiorari denied, 1963; Parish v. Standard Accident Insurance Company, 158 So.2d 892 (La. App. 3rd Cir. 1964).
The defendants contend further that the alleged tender made on January 3, 1968, has the effect of precluding the *345 court from awarding penalties and attorney's fees. An examination of the proces verbal accompanying the tender shows that the amount tendered was $1,230.00, computed by subtracting from the amount for permanent partial disability (200 weeks at $10.00 per week or $2,000.00) the amount paid for temporary total disability ($770.00) as a credit. This, together with court costs to date in a separate check, was offered in full settlement of the liability for partial impairment of plaintiff's arm.
This alleged tender is not truly a tender such as contemplated in our law. It is actually an offer of settlement. It consisted of offering to plaintiff a check or "Draft Type 4"[1] drawn on Bituminous Casualty Corporation as a "settlement",[2] at a deposition session in the Pontchartrain Hotel. The offer was rejected because suit had been filed, seeking, in addition to compensation benefits, the statutory penalties and attorney's fees. The check, together with a check for court costs and the proces verbal of the proceedings, was then filed in a sealed envelope numbered with the suit in the Clerk of Court's office.
Since the offer came over seven months after suit was filed and a year after plaintiff had been cut off from benefits, we believe penalties and attorney's fees were clearly due, and a tender of the basic amount due, without regard for these two items, was insufficient. It had the effect of simply seeking a compromise of all of plaintiff's claims for the basic sum he was undeniably due all along. Plaintiff could obtain payment of the check only as a settlement in full.
The trial became necessary because no additional amounts were tendered for these two items. In view of the brevity of the trial and the fact that the evidence adduced was as much concerned with the question of penalties and attorney's fees as with the merits of plaintiff's compensation claim, we cannot limit defendants' liabilities simply to the date of tender of the insufficient amount.
The trial judge awarded penalties at the rate of 12% on all amounts due and owing and attorney's fees of $1,500.00. We are of the opinion his judgment should be affirmed.
Affirmed.
NOTES
[1] So stated on the face of the document.
[2] So stated on the face of the document.