GULOTTA, Judge.
Plaintiff, Eliga Moore, individually and in his capacity as tutor and administrator of his son’s estate, filed suit for workmen’s compensation, penalties and attorney’s fees. A compromise was reached for the amount of compensation and the matter was tried on the question of penalties and attorney’s fees.[1] It was submitted on depositions, exhibits and memoranda of counsel.
From a judgment in favor of plaintiff, defendants suspensively appeal.
On April 12, 1968 David Ray Moore, age 13, while employed by Dixie Donut, Inc., as the operator of a glazer machine, caught his shoelace in the mechanism causing him to fall to the concrete floor. As a result, David sustained injury to his left hip which developed into osteomyelitis of the left ischium requiring hospitalization on three occasions. The first occurred two weeks after the accident for an eleven-day period. Treatment was administered with antibiotics by Dr. Kenneth Cox. Next, on June 10, 1968 a biopsy performed by Dr. Walter Brent showed osteomyelitis. Finally, because David continued to experience recurrent fever, pain in the hip area, difficulty in walking and standing as well as a decrease in motion in the joint, another operation was performed on February 18, 1971. The examination by Dr. Brent at that time revealed a staphylocci infection as well as “smoldering chronic osteomyeli-tis.”
Defendants, in seeking to be relieved of the payment of penalties and attorney’s fees, point out that the accident was reported to them on July 22, 1968, approximately three months after its occurrence. They suggest the reasons for the delay was because the injured boy’s father is one of the owners of Dixie Donut, Inc., and it was not until it appeared that medical bills would be oppressive that the insurer was contacted.
Defendant further argues that a letter from Dr. Brent dated August 23, 1968, indicated no residual disability. It was not until the November 11, 1968 report of Dr. Redler that some residual was indicated; however, no percentage was particularized. Furthermore, no demand for payment of compensation was made up to this point, though plaintiff’s attorney indicated that he represented the plaintiff on December 26, 1968. No formal demand for weekly benefits was made until January 30, 1969.
Compensation was then paid to plaintiff in March, 1969 for a twenty-four week period from April 13, 1968 through September 27, 1968 (totaling $599.04), which, according to defendant, brought payments current at that time.
According to defendant, no documentation of disability or change of the boy’s medical status was submitted to the insurer indicating anything different from that of August 8, 1968 at which time David stated *629 he had resumed work as a bagger but not as a glazer. Defendant points out that in a deposition of July 10, 1969 Dr. Brent stated the boy was cured on January 16, 1969 and though he had a disability of the left lower extremity, it was his opinion that David could return to work. On December 17, 1969 disability in the sum of $10 per week was tendered based on Dr. Brent’s opinion. This was refused by plaintiff. Defendants further insist that while Dr. Redler’s report of May 12, 1970 indicated a permanent partial disability, there was no medical evidence at that time to substantiate plaintiff’s claim for total permanent disability. It was not until March 29, 1971 that a subsequent report of Dr. Brent indicated David would be disabled for some period of time. On October 8, 1971 in the deposition of Dr. Brent, he stated that a staphylococci infection as well as smoldering chronic osteomyelitis resulted from that injury. It was then that a settlement was made with plaintiff. For the above reasons, defendant argues its actions were not arbitrary and capricious.
Our consideration of the chronology of medical examinations, treatments and reports leads to a contrary conclusion.
It is significant that a written statement was made by David to the insurance company representative on August 8, 1968 that he had been in the hospital for five days having his leg bone scraped. Further, on August 23, 1968 Dr. Brent advised the insurer that the operation had occurred and that the boy was still undergoing treatment. On October 18, 1968 the insurer was notified by Dr. Cox that the child had os-teomyelitis and was discharged from the hospital on June 21, 1968. Furthermore, he was unable to return to work at that time. Dr. Cox further advised that the treatment would be for an indefinite period.
On November 6, 1968 David was seen by Dr. Irving Redler. His report dated November 11, 1968 indicated that he developed osteomyelitis and that he had residual disability as a result of the infection and the operative intervention. It was his opinion the prognosis was guarded pending further examination. A further report of Dr. Redler dated February 10, 1969 indicated that David had a residual disability of IS percent of the left hip. He suggested re-examination in about six months. The report of Dr. Redler dated May 12, 1970, indicated a permanent partial disability.
On December 26, 1968 notice of representation by plaintiff’s attorney was sent to the insurer. On January 6, 1969 though the insurer had knowledge of the injury, only the medical was paid. No compensation payments were made with the exception of the twenty-four week payment totaling $599.04, despite the medical information in defendant’s file as of February 10, 1969 showing partial permanent disability.
Not only Dr. Brent, the orthopedist by whom the boy originally was treated, but also Dr. Redler, the orthopedist selected by defendant to examine the boy, reported that young David suffered injury resulting in residual disability. This knowledge was within the keeping of the insurer in 1969 and 1970, yet it was not until after October 8, 1971 that a compromise settlement was made, according to defendant, on the basis of “a commuted value payment of permanent and total disability, together with payment of the entire medical limit provided by law.”
It is clear that the defendants failed to make compensation payments after they had knowledge of the severity of the injury with the realization that the boy had residual disability. As stated in Breen v. Bituminous Casualty Company, 249 So.2d 338 (La.App. 4th Cir. 1971),
“The principle that the insurer cannot cut off weekly compensation benefits when it knows that the employee is at least partially disabled is well established in our law. When it does so, its arbitrary action will subject it to the statuto *630 ry penalties. Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695 (1952); Mitchell v. Connecticut Indemnity Company, 161 So.2d 460 (La.App. 1st Cir. 1963), certiorari denied, 1963; Parish v. Standard Accident Insurance Company, 158 So.2d 892 (La.App. 3rd Cir. 1964).”
We are of the opinion that the record amply supports the trial court’s conclusion that the action of defendant insurer was arbitrary and capricious. Accordingly, the judgment is affirmed.
Affirmed.

. LSA-R.S. 22:658 reads in part:
“ * * * Failure to make such payment, within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, * * * ”